Mark Aussieker
Kimberly Aussieker
8830 Olive Ranch Lane
Fair Oaks, CA 95628
Phone: 916-705-8006
aussieker1@gmail.com

*in pro per*

**FILED**

JAN 14 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mark Aussieker & Kimberly Aussieker<br><br>Plaintiff(s),<br><br>v.<br><br>STACCATO PROPERTIES, LLC,<br>VIRGIL MATEO AND CHRISTOPHER<br>ESPINEDA<br><br>Defendant(s) | No. 2:19-CV-00089-TLN-DB<br><br>**COMPLAINT FOR DAMAGES**<br>Trial by Jury not requested |

**Preliminary Statement**

Plaintiffs  MARK and KIMBERLY AUSSIEKER ("Plaintiffs"), on behalf of themselves allege as

follows:

      1.     Plaintiff Mr. and Mrs. Aussieker ("Plaintiffs" or "THE AUSSIEKERS")

brings this action to enforce the consumer-privacy provisions of the Telephone Consumer

Protection Act "TCPA", 47 U.S.C. § 227,  a federal statute enacted in 1991 in response to

widespread public outrage about the proliferation of intrusive, nuisance telemarketing

practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

1

2.      Upon information and belief, Defendants by and through its agents and vendors,  placed telemarketing calls to telephone numbers Mr. and Mrs. Aussieker had registered on the national Do Not Call Registry without Mr. or Mrs. Aussieker's consent. As a result, Defendants are liable for those calls[1].  Dropcowboy was the software company utilized and they require that markers ensure TCPA compliance.

### PARTIES

3.      Plaintiff Mark Aussieker is an individual and resident of the state of California.

4.      Plaintiff Kimberly Aussieker is an individual and resident of California.

5.      Mr. and Mrs. Aussieker ("Plaintiffs" or "THE AUSSIEKERS") are husband wife and join this action as one.

6.      Defendant STACCATO PROPERTIES, LLC is a California Limited liability Corporation, and is a "person" as defined by 47 US.C. § 153 (39). Will be referred to as "DEFENDANT STACCATO" or "DEFENDANTS"

7.      Defendant Virgilio Mateo is a Member Manager, of STACCATO PROPERTIES, LLC and will be referred to as "DEFENDANT VIRGILIO"

8.      Defendant Christopher Espineda is a Member Manager, of STACCATO PROPERTIES, LLC and will be referred to as "DEFENDANT Espineda" or "ESPINEDA"

### Jurisdiction & Venue

9.      The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740 (2012).

10.      Venue is proper pursuant to 28 U.S.C. § 1391 (b)(2) because the Plaintiff is a resident of this district, which is where he received the illegal telemarketing calls that are the subject of this lawsuit.

---

[1] Defendant or its agent hired Dropcowboy to send voicemails.  Defendant is liable per *Charvat v. Echostar* and *United States v. Dish Network* matters (FCC-13-54A1 (Dec. Ruling))

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this District.

12.     This Court has personal jurisdiction over the parties because Defendants systematically and continually have conducted business in the State of California. Likewise, Plaintiff's rights were violated in the State of California and his claims arose out of his contact with Defendants from California.

TCPA Background

13.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

**THE TCPA PROHIBITS TELEMARKETING CALLS TO NUMBERS LISTED ON THE DO NOT CALL REGISTRY, UNLESS THE CALLER HAS THE RECIPIENT'S SIGNED, WRITTEN CONSENT.**

14.     The national Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

15.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry.  47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

16.     A person whose number is on the Registry, and who has received more than

one telephone call within any twelve-month period by or on behalf of the same entity in violation of the TCPA, can sue the violator and seek statutory damages.   47 U.S.C. § 227(c)(5).

17.     The regulations exempt from liability a caller who has obtained the subscriber's signed, written agreement to receive telephone solicitations from the caller. 47 C.F.R. § 64.1200(c)(2)(ii). That agreement must also include the telephone number to which the calls may be placed. *Id.*

## Factual Allegations

18.     Plaintiffs Mark phone number 916-705- 8006 was added to the "Do not call" list in February 2003

19.     Plaintiffs Kimberly phone number 916-607-7087 alleges on information and belief that her phone number was added to the "Do not call" list in 2005, however due to current partial federal government shut down, FTC website can not confirm this date.

20.     DEFENDANTS do business in California, with the principal purpose of wholesaling real estate

21.     DEFENDANTS engaged in the practice of "Direct to voicemail" marketing as detailed in the in US patent[1] and attached as exhibit B.

22.     The process for forcing a call to voicemail AKA "Direct to voicemail"[2] is as follows:

    o   Dialer calls target phone number to busy out the call destination channel.

---

[1] US patent 8,605,869 METHOD AND APPARATUS FOR FORCING A CALL TO A CARRIER PROVIDED VOICEMAIL FACILITY

[2] In simple terms, a computer makes two calls almost simultaneously, but with a carrier specific delay between the two calls so the second call always goes to voicemail and the 1st call releases before the target phone rings.

4

o   The dialer places a 2nd call (the actual Voice message) after confirmation that the 1st call has initiated with the call destination channel, forcing the second call to the carrier's voice mail facility, since the first call busied the first channel.

23.     On January 12, 2019 DEFENDANTS or its authorized agent forced a message on to plaintiffs Mark Aussieker's voice mail facility. In delivering that message, DEFENDANTS caused two calls to be made to plaintiffs MARKS cellular telephone.  A screen shot of the message and a transcription of the message is found on Exhibit A- Figure 1.

24.     (the "First Call to Mark') to Plaintiffs MARKS cellular telephone number (916-705-8006) was for the purpose of busying out the call destination channel- as detailed in the patent.

25.     (the "Second Call to Mark') to Plaintiffs MARKS cellular telephone number (916-705-8006) was for the purpose of delivering the pre recorded voice message that appears in voice mail box, since the first call busied the first channel- the process detailed in the patent.

26.     Defendants used an "automatic telephone dialing system" as defined by 47 U.S.C. § 227(a)(1) to place the calls to Plaintiff since the calls have to be coordinated, a process described in the patent.

27.     During all relevant times, Defendants did not possess Plaintiff's "prior express consent" to receive calls using an automatic telephone dialing system or an artificial or prerecorded voice on his cellular telephone pursuant to 47 U.S.C. § 227(b)(1)(A).[3]

28.     Defendant's calls constituted calls that were not for emergency purposes as

---

[3] *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC Report and Order, CG Docket No. 02-278 (Feb. 15, 2012) ("*2012 Report and Order*").  ¶ 68 ("Once our written consent rules become effective, however, an entity will no longer be able to rely on non-written forms of express consent to make autodialed or prerecorded voice telemarketing calls, and thus could be liable for making such calls absent prior written consent.").  However, non-telemarketing calls are unaffected by the revised regulations.  *See id.* ¶ 28 ("[W]hile we revise our consent rules to require prior express written consent for autodialed or prerecorded *telemarketing* calls, we maintain the existing rules for *non-telemarketing, informational* calls.") (emphasis in original)

defined by 47 U.S.C. § 227(b)(1)(A).

29.    The originating caller id indicated the call originated from 415-723-5436, and Plaintiff has confirmed that number to be of the DEFENDANTS.

30.    The person leaving the voice message purports to have "just driven by the plaintiffs property"

31.    Plaintiff MARK does not own any real property in Sacramento. He realizes it is very unlikely for someone to drive by properties hours after dark and decided to investigate the campaign of deception that has been initiated upon him.

32.    Plaintiff MARK suffered a "concrete injury" in the annoyance of being bothered and also having to worry that his phone was missing phone calls by seeing voicemails show up.

33.    On 1/13/19- Plaintiff Mark Aussieker learned that his wife Kimberly, received the same exact message a few minutes before he did.  Kimberly reported to Mark that message appeared without missing a call.  A screen shot of the transcribed voicemail is  Attached as exhibit A- Figure 2

34.    On January 13th, 2019 DEFENDANTS Plaintiffs Mark and Kimberly Aussieker compares the messages and realize they are the same exact recording.

35.    On January 13th, 2019 it is learned that On January 11th, 2019 DEFENDANTS or its authorized agent forced a message on to plaintiffs Kimberly Aussieker's voice mail facility. In delivering that message, DEFENDANTS caused two calls to be made to plaintiffs KIMBERLYS cellular telephone.

36.    (the "first Call to Kimberly") to Plaintiffs cellular telephone number (916-607-7087) was for the purpose of busying out the call destination channel- as detailed in the patent.

37.    (the "Second Call to Kimberly ') to Plaintiffs cellular telephone number (916-607-7087) was for the purpose of delivering the pre recorded voice message that appears in

voice mail box, since the first call busied the first channel- the process detailed in the patent[5].

32.      Plaintiff KIMBERLY suffered a "concrete injury" in the annoyance of being bothered, lost time and also having to worry that her phone was missing phone call.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant for the following:

. <u>COUNT 1</u>

(1st call to Mark- Violation of the Telephone Consumer Protection Act, 47 U.S.C.

§227(c)(5)(B)

25.  Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing paragraphs.

26.  Defendant's own conduct and/or by the fact that others made those calls on its behalf , ignoring the Do-Not-Call List, as demonstrated  by Defendant's  Call to Plaintiffs  cell phone,  violated 47 U.S.C.§227(c)(5)(B) and 47 C.F.R. §64.1200(d)(6) and, therefore, Plaintiff is entitled to an award of statutory damages in the minimum amount of $500 for this violation.

27.  Defendant's own conduct and/or by the fact that others made those calls on its behalf , in failing to check the numbers against the do not call list constitutes a knowing and/or willful violation of 47 U.S.C. §227(c)(5)(B) and 47 C.F.R. §64.1200(d)(2) .  Plaintiff is entitled to an award of statutory treble damages in the amount of $1,500 for this violation.

<u>COUNT 2</u>

(2nd call to Mark- Violation of the Telephone Consumer Protection Act, 47 U.S.C.

§227(c)(5)(B)

28.  Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing paragraphs.

29.  Defendant's own conduct and/or by the fact that others made those calls on its behalf , ignoring

---

[5] US patent 8,605,869 METHOD AND APPARATUS FOR FORCNG A CALL TO A CARRIER PROVIDED VOICEMAIL FACILITY

the Do-Not-Call List, as demonstrated by Defendant's Call to Plaintiffs cell phone, violated 47 U.S.C.§227(c)(5)(B) and 47 C.F.R. §64.1200(d)(6) and, therefore, Plaintiff is entitled to an award of statutory damages in the minimum amount of $500 for this violation.

30. Defendant's own conduct and/or by the fact that others made those calls on its behalf, in failing to check the numbers against a cell phone list constitutes a knowing and/or willful violation of 47 U.S.C. §227(c)(5)(B) and 47 C.F.R. §64.1200(d)(2). Plaintiff is entitled to an award of statutory treble damages in the amount of $1,500 for this violation.

**COUNT 3**

**(1st call to Mark - Violation of the Telephone Consumer Protection Act, 47 U.S.C.**

**§227(b)(1)(A)(iii) – Auto Dialer**

31. Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing paragraphs.

32. Defendant's own conduct (b) by the fact that others made those calls on its behalf by placing a Call to Plaintiff's cell phone using an automated dialing system, violated 47 C.F.R. § 64.1200(a)(2) and 47 U.S.C. § 227(b)(1)(D) and, therefore, Plaintiff is entitled to an award of statutory damages in the minimum amount of $500 for this violation.

33. As a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227(b), Plaintiff is entitled to an award of $1,500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

**COUNT 4**

**(2nd call to Mark - Violation of the Telephone Consumer Protection Act, 47 U.S.C.**

**§227(b)(1)(A)(iii) – Auto Dialer**

34. Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing paragraphs.

35. Defendant's own conduct (b) by the fact that others made those calls on its behalf by

placing a Call to Plaintiff's cell phone using an automated dialing system, violated 47 C.F.R. § 64.1200(a)(2) and 47 U.S.C. § 227(b)(1)(D) and, therefore, Plaintiff is entitled to an award of statutory damages in the minimum amount of $500 for this violation.

36.  As a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227(b), Plaintiff is entitled to an award of $1,500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

## COUNT 5

**(2nd call to Mark - Violation of the Telephone Consumer Protection Act, 47 U.S.C.**
**§227(b)(1)(A)(iii) – Pre Record Message**

37.   Defendants' conduct, in placing the Call to Plaintiff's cell phone to deliver an unsolicited pre recorded message to Plaintiff without Plaintiff's prior express consent or approval, constitutes a violation of 47 U.S.C. §227(b)(l)(B) and 47 C.F.R. §64.1200(a)(2) and, therefore, Plaintiff is entitled to an award of statutory damages in the minimum amount of $500 for this violation.

38.   Defendant's own conduct and/or by the fact that others made those calls on its behalf , in placing the Call to Plaintiff's cell phone to deliver an unsolicited advertisement to Plaintiff without Plaintiff's prior express consent or approval, constitutes a knowing and/or willful violation of 47 U.S.C. §227(b)(l)(B) and CFR 47§64.1200(a)(2) and, therefore, Plaintiff is entitled to an award of statutory treble damages in the amount of $1,500 for this violation

## COUNT 6

**(1st call to Kimberly- Violation of the Telephone Consumer Protection Act, 47 U.S.C.**
**§227(c)(5)(B)**

39.  Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing paragraphs.

40.  Defendant's own conduct and/or by the fact that others made those calls on its behalf , ignoring the Do-Not-Call List, as demonstrated  by Defendant's Call to Plaintiffs  cell phone, violated

47 U.S.C.§227(c)(5)(B) and 47 C.F.R. §64.1200(d)(6) and, therefore, Plaintiff is entitled to an award of statutory damages in the minimum amount of $500 for this violation.

41. Defendant's own conduct and/or by the fact that others made those calls on its behalf , in failing to check the numbers against the do not call list constitutes a knowing and/or willful violation of 47 U.S.C. §227(c)(5)(B) and 47 C.F.R. §64.1200(d)(2). Plaintiff is entitled to an award of statutory treble damages in the amount of $1,500 for this violation.

#### COUNT 7

**(2nd call to Kimberly - Violation of the Telephone Consumer Protection Act, 47 U.S.C.**
**§227(c)(5)(B)**

42. Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing paragraphs.

43. Defendant's own conduct and/or by the fact that others made those calls on its behalf , ignoring the Do-Not-Call List, as demonstrated  by Defendant's  Call  to Plaintiffs  cell phone,  violated 47 U.S.C.§227(c)(5)(B) and 47 C.F.R. §64.1200(d)(6) and, therefore, Plaintiff is entitled to an award of statutory damages in the minimum amount of $500 for this violation.

44. Defendant's own conduct and/or by the fact that others made those calls on its behalf , in failing to check the numbers against a cell phone list constitutes a knowing and/or willful violation of 47 U.S.C. §227(c)(5)(B) and 47 C.F.R. §64.1200(d)(2) . Plaintiff is entitled to an award of statutory treble damages in the amount of $1,500 for this violation.

#### COUNT 8

**(1st call to Kimberly - Violation of the Telephone Consumer Protection Act, 47 U.S.C.**
**§227(b)(1)(A)(iii) – Auto Dialer**

45. Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing paragraphs.

46. Defendant's own conduct (b) by the fact that others made those calls on its behalf by placing a Call to Plaintiff's cell phone using an automated dialing system, violated 47 C.F.R.

§ 64.1200(a)(2) and 47 U.S.C. § 227(b)(1)(D) and, therefore, Plaintiff is entitled to an award of statutory damages in the minimum amount of $500 for this violation.

47. As a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227(b), Plaintiff is entitled to an award of $1,500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

**COUNT 9**

**(2nd call to Kimberly - Violation of the Telephone Consumer Protection Act, 47 U.S.C.**

**§227(b)(1)(A)(iii) – Auto Dialer**

48. Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing paragraphs.

49. Defendant's own conduct (b) by the fact that others made those calls on its behalf by placing a Call to Plaintiff's cell phone using an automated dialing system, violated 47 C.F.R. § 64.1200(a)(2) and 47 U.S.C. § 227(b)(1)(D) and, therefore, Plaintiff is entitled to an award of statutory damages in the minimum amount of $500 for this violation.

50. As a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227(b), Plaintiff is entitled to an award of $1,500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

**COUNT 10**

**(2nd call to Kimberly - Violation of the Telephone Consumer Protection Act, 47 U.S.C.**

**§227(b)(1)(A)(iii) – Pre Record Message**

51.    Defendants' conduct, in placing the Call to Plaintiff's cell phone to deliver an unsolicited pre recorded message to Plaintiff without Plaintiff's prior express consent or approval, constitutes a violation of 47 U.S.C. §227(b)(l)(B) and 47 C.F.R. §64.1200(a)(2) and, therefore, Plaintiff is entitled

11

to an award of statutory damages in the minimum amount of $500 for this violation.

52.   Defendant's own conduct and/or by the fact that others made those calls on its behalf, in placing the Call to Plaintiff's cell phone to deliver an unsolicited advertisement to Plaintiff without Plaintiff's prior express consent or approval, constitutes a knowing and/or willful violation of 47 U.S.C. §227(b)(l)(B) and CFR 47§64.1200(a)(2) and, therefore, Plaintiff is entitled to an award of statutory treble damages in the amount of $1,500 for this violation

## **COUNT 12**

MALICE.

53.   The member managers of DEFENDANT STACCATO PROPERTIES, LLC had a duty to "Carry out every other act not inconsistent with law that is appropriate to promote and attain the purposes set forth in its articles of organization.[5]"

54.   Defendants ESPINEDA and Defendant VIRGILIO knew of the Telephone Consumer Protection act and the Federal "Do Not Call List"

55.   Defendants ESPINEDA and Defendant VIRGILIO knew or should have known that the plaintiffs did not want to be contacted by telemarketers when plaintiffs registered for the Do Not Call list.

56.   Defendants ESPINEDA and Defendant VIRGILIO knew or should have known that by leaving voice messages on the plaintiffs voicemail, they were contacting them against the plaintiffs wishes and they were violating the Telephone Consumer Protection act.

57.   Defendants ESPINEDA and Defendant VIRGILIO breached their fiduciary duty to STACCATO PROPERTIES, LLC by violating California Corporations Code 17701.05

---

[5] California Corporations Code 17701.05 (t)

12

(t) and 47 U.S.C. § 227 et seq.

58.   "Malice" for purposes of § 523(a)(6), was defined by the Supreme Court in Tinker v. Colwell, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), as "a wrongful act, done intentionally, without just cause or excuse." Id. at 485–86, 24 S.Ct. 505 (internal quotation marks and citation omitted); see also Markowitz v. Campbell (In re Markowitz), 190 F.3d 455 (6th Cir. 1999). The Sixth Circuit has interpreted the malice component of § 523(a)(6), as "means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986).

59.   Defendants ESPINEDA and Defendant VIRGILIO intentionally contacted plaintiffs against plaintiffs will, without just cause or excuse and in doing the wrongful act, violated the TCPA along with breaching their duty to follow the law[6].

**COUNT 13**

**RATIFICATION**

60.   Plaintiffs incorporate herein by reference the preceding paragraphs as if fully set forth herein, and count against Defendant ESPINEDA and Defendant VIRGILIO

61.   Despite ESPINEDA and Defendant VIRGILIO knowledge of the Direct to voicemail marketing scheme, no action was taken to stop the illegal marketing scheme.

62.   At the time of the acts alleged herein, there was an actual or assumed agency relationship between Defendant ESPINEDA and Defendant VIRGILIO as Member-managers of  STACCATO PROPERTIES, LLC 's.

63.   Both ESPINEDA and VIRGILIO, adopted and approved the direct to voicemail marketing scheme. Both Defendants ESPINEDA and VIRGILIO are individually

[6] California Corporations Code 17701.05 (t)

responsible for the violations. The general tort rule that 'corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body[7]. Member Managers ESPINEDA and Defendant VIRGILIO are thus responsible for violations of 47 U.S.C. § 227 et seq.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against STACCATO PROPERTIES, LLC, VIRGIL MATEO AND CHRISTOPHER ESPINEDA, both jointly and severally for the following:

    1.    Injunctive relief prohibiting such violations of the TCPA by Defendants in the future.

    2.    For an order finding in favor of Plaintiff, on all counts asserted herein;

    3.    For an order awarding statutory damages to plaintiff in the sum certain amount of $15,000 as detailed in counts 1-10

    4.    For a declaration that STACCATO PROPERTIES, LLC, VIRGIL MATEO AND CHRISTOPHER ESPINEDA acted with Malice towards Plaintiff.

    5.    For such other and further relief as the court deems proper

Respectfully Submitted this 14th Day of January, 2019.

Certification and Closing Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

---

[7] '"Universal Elections, 787 F. Supp. 2d at 416 (internal citations omitted); see also Am. Blastfax,Inc., 164 F. Supp. 2d at 898

1

2

3    Date of signing: JAN 14th , 2019 .

4    Signature of Plaintiff
     _Mel Ussi_____

5    Printed Name of Plaintiff MARK Aussieker_____

6

7

8

9    Date of signing: Jan. 14th , 2019 .

10   Signature of Plaintiff
     _Kimberly D. Amoreln_____

11   Printed Name of Plaintiff Kimberly D. Aussieker_____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

| FIGURE 1 | FIGURE 2 |
| VOICEMAIL FOR MARK | VOICEMAIL FOR KIMBERLY |



TRANSCRIPTION

Hey there, this is Virgil with STACCATO PROPERTIES. I was calling in regards to your property in Sacramento. I drove by it and wanted to reach out to possibly give you a no obligation cash offer. My company partners with accredited investors in the Sacramento area and we can close in as little as 17 days. If you are interested, could please give me a call back my number is 415- 723-5436. I appreciate your time looking forward to hearing back from you…"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit B

US008605869B1

(12) **United States Patent**   (10) **Patent No.:**   **US 8,605,869 B1**

Mobarak et al.   (45) **Date of Patent:**   **Dec. 10, 2013**

(54) **METHOD AND APPARATUS FOR FORCING A CALL TO A CARRIER PROVIDED VOICE MAIL FACILITY**

(75) Inventors: **Toufic Boutros Mobarak**, Newton, MA (US); **Ashou Han**, Winchester, MA (US)

(73) Assignee: **Mobilesphere, Ltd.**, Boston, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1153 days.

(21) Appl. No.: **12/188,821**

(22) Filed: **Aug. 8, 2008**

(51) **Int. Cl.**
*H04M 11/00* (2006.01)
*H04L 12/16* (2006.01)
*G06F 12/00* (2006.01)

(52) **U.S. Cl.**
USPC ........ **379/88.17**; 379/260; 370/324; 370/335; 370/338; 370/352; 379/88.04; 379/88.19; 379/133; 379/217.01; 379/221.02; 382/115; 455/67.11; 455/412.2; 455/427; 455/450; 455/519; 711/161; 713/170; 713/182; 726/13

(58) **Field of Classification Search**
USPC .......... 379/88.04, 88.13, 88.14, 88.17, 88.19, 379/217.01, 221.01, 221.02, 67.1, 133; 382/115; 455/67.11, 412.2, 418, 433, 455/519, 450, 427; 713/170, 182; 726/13; 370/260, 335, 324, 338, 352; 707/999.01; 711/161
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| RE28,577 | E | * | 10/1975 | Schmidt .............. 370/324 |
| 5,509,055 | A | * | 4/1996 | Ehrlich et al. .............. 379/133 |
| 5,933,488 | A | * | 8/1999 | Marcus et al. .............. 379/217.01 |
| 6,061,432 | A | * | 5/2000 | Wallace et al. .............. 379/88.18 |
| 6,215,857 | B1 | * | 4/2001 | Kasiviswanathan ........ 379/67.1 |
| 6,330,308 | B1 | * | 12/2001 | Cheston et al. ............ 379/88.04 |
| 6,473,414 | B1 | * | 10/2002 | Hartley et al. .............. 370/338 |
| 6,529,731 | B2 | * | 3/2003 | Modzelesky et al. ........ 455/427 |
| 6,748,068 | B1 | | 6/2004 | Walsh et al. |
| 6,801,615 | B2 | * | 10/2004 | Stumer et al. .............. 379/221.02 |
| 6,810,114 | B2 | * | 10/2004 | Wellley .................. 379/88.18 |
| 6,983,370 | B2 | * | 1/2006 | Eaton et al. .............. 713/182 |
| 7,031,438 | B1 | * | 4/2006 | Cheston et al. .......... 379/88.14 |
| 7,228,145 | B2 | * | 6/2007 | Burritt et al. .............. 455/519 |
| 7,245,713 | B1 | * | 7/2007 | Simpson et al. ........ 379/221.01 |
| 7,382,752 | B2 | * | 6/2008 | Melhuish .................. 370/335 |
| 7,412,232 | B2 | * | 8/2008 | Wilson et al. .............. 455/418 |

(Continued)

*Primary Examiner* — Gerald Gauthier

(74) *Attorney, Agent, or Firm* — Burns & Levinson LLP; Bruce D. Jobse, Esq.

(57) **ABSTRACT**

Disclosed are systems and techniques by which a caller may specify a callee's telephone number and be connected directly to a carrier provided voice mail facility associated with the identified telephone number, even though the callee's carrier may not be the same as the caller's carrier. In the disclosed technique, a telephony server places a "Send a call" request to a server which then sends a signaling call that busies out the channel associated with the callee. The telephony server places a second call (the actual voice message) upon confirmation that the signaling call has been initiated, forcing the second call to the carrier's voice mail facility associated with the callee, since the first signaling call busied the first channel. Prior to sending the signaling call, a database look up is performed to determine which carrier services the callee number. Once the carrier is determined, another memory look up is performed to determine the time delay associated with that carrier. The time delay is then counted upon initiation of the first signaling call and the signaling call terminated upon expiration of the delay period. A user interface is provided by which a caller may specify the number of the intended callee by either a web interface, an external telephony interface such as an Interactive Voice Response (IVR) facility, an interface mechanism internal to a caller's private telephony network, or an automated number capture mechanism.

35 Claims, 7 Drawing Sheets



US 8,605,869 B1

1

## METHOD AND APPARATUS FOR FORCING A CALL TO A CARRIER PROVIDED VOICE MAIL FACILITY

### FIELD OF THE INVENTION

This disclosure relates generally to the field of telephony, more specifically, to a method and system for forcing a telephone call to a carrier provided voice mail facility associated with the callee.

### BACKGROUND OF THE INVENTION

The advent of voice machines connectable to traditional telephony equipment, and, more recently, voicemail services offered by a telephone carrier, have created the ability for asynchronous voice. The ability to communicate asynchronously using voice data provides a viable option to real-time or synchronous voice, particularly when a callee is difficult to reach. In addition, it is not always desirable to establish voice communication directly with the callee. For example, a caller may desire to leave a voice message with a particular callee, however, establishing a call at that particular instance may not be appropriate because of different time zones, business etiquette, or other reasons to avoid a direct real-time communication with the callee.

Select telephony carriers offer voicemail facilities to their respective subscribers. Some of these voicemail facilities offer the callee the functionality of, while reviewing messages in the callee voicemail box, sending a responsive voicemail to the voice mailbox of the caller. Such communications are implemented from one voicemail box to another, within the inter-carrier network, without actually initiating any communication connection over a PSTN or VOIP network between the parties. Also, such responses are usually limited to parties who subscribe to the same carrier, that is, a callee cannot leave a responsive voicemail through his or her voice mail facility for a caller who's call originated from another carrier's network.

Even with the advent of Voice Over Internet Protocol (VOIP) technology, it is not usually possible to be connected directly to a voice mail facility associated with a particular communication line, without first attempting to establish a real-time voice data call and without the callee being notified of the incoming call. In most instances, a caller does not have the option of being connected directly to a callee's voicemail box or service, especially between different carriers.

Accordingly, a need exists for the ability to establish a connection directly to the voicemail associated with a callee without the callee being notified of the incoming call or without the callee being able to answer the incoming call.

Accordingly, another need exists for the ability to establish a connection directly to the voicemail associated with a callee in a manner that is more efficient than any prior attempted solutions.

A further need exists for the ability to establish a connection directly to the voicemail functionality provided by a telephone carrier that is different from the caller's telephone carrier.

Furthermore, a need exists for ability to establish a connection directly to a callee's voicemail facility that is not carrier sensitive.

### BRIEF DESCRIPTION OF THE DRAWINGS

The above and other features, objects and advantages of the disclosure will be better understood by referring to the following detailed description in conjunction with the accompanying drawing in which:

2

FIG. 1 is a block diagram of a prior art computer system suitable for use with the disclosed system;

FIG. 2 is a conceptual diagram of a first phone server system and communications environment in accordance with the disclosed system;

FIG. 3 is a conceptual diagram of a second phone server system and communications environment in accordance with the disclosed system;

FIG. 4 is a flow chart illustrating the processes performed in accordance with the disclosed system;

FIG. 5 is a conceptual diagram of the message protocol in accordance with the disclosed system; and

FIGS. 6A-B are conceptual diagrams of a data structures in accordance with the disclosed system.

### SUMMARY OF THE INVENTION

Disclosed are systems and techniques by which a caller may specify a callee's telephone number and be connected directly to a carrier provided voice mail facility associated with the identified telephone number, even though the callee's carrier may not be the same as the caller's carrier. In the disclosed technique, a telephony server places a "Send a call" request to a server which then sends a signaling call that busies out the call destination channel associated with the callee. The telephony server places a second call (the actual voice message) after upon confirmation that the signaling call has initiated with the call destination channel, forcing the second call to the carrier's voice mail facility associated with the callee, since the first signaling call busied the first channel. Prior to sending the signaling call, a database look up is performed to determine which carrier services the callee number. Once the carrier is determined, another memory look up is performed to determine the time delay associated with that carrier. The time delay is then counted from the time of initiation of the signaling call and the signaling call terminated upon expiration of the time delay period. In this manner, the first signaling call cannot be answered by the callee, as the callee is not aware of the signaling calls presence since the duration of the call was not long enough to alert the callee. A user interface may be provided by which a caller may specify the number of the intended callee by either a publically accessible web interface or telephony interface, such as an Interactive Voice Response (IVR) facility, an interface mechanism internal to a caller's private telephony network, or an automated number capture mechanism.

In a second disclosed technique the telephony server places two almost simultaneous calls. The two calls are separated by the period of time necessary for telephony server to confirm that the first call has been established with the call destination channel. Once such confirmation is received the telephony server initiates a second call to the call destination channel. Simultaneously, the first call is terminated after a predetermined time delay which is carrier specific and which may be tracked using a software timer. The first call busies out the call destination channel associated with the callee. The second call (the actual voice message) forces the second call to the carrier's voice mail facility associated with the callee, since the first call busies the first channel.

According to a first aspect, a method for communicating directly with a carrier provided voicemail facility associated with a call destination channel comprises: A) initiating a first communication connection with the call destination channel; B) initiating a second communication connection to the call destination channel; and C) terminating the first communication connection within a predetermined time period following initiation of the first communication connection.

US 8,605,869 B1

3

According to a second aspect, a method for forcing a communication connection with a carrier provided voicemail facility associated with a call destination channel comprises: (a) busying the destination the call channel without alerting the callee; and (b) establishing a voice connection with the carrier provided voicemail facility associated with the call destination channel.

According to a third aspect, a computer program product for use with a computer system operatively coupled to a communication network comprises a computer readable medium having program code embodied thereon comprising: (a) program code for initiating a first communication connection with a call destination channel: B) program code for initiating a second communication connection to the call destination channel: and C) program code for terminating the first communication connection within a predetermined time period following initiation of the first communication connection.

According to a fourth aspect, a computer program product for use with a computer system operatively coupled to a communication network comprises a computer readable medium having program code embodied thereon comprising: (a) program code for busying a destination call channel without alerting the callee; and (b) program code for establishing a voice communication connection with a carrier provided voicemail facility associated with the call destination channel.

According to a fifth aspect, an apparatus for use with a communications network comprises: (a) a processor; (b) a memory coupled to the processor for maintaining a plurality of carrier identifiers, selected of the carrier identifiers having associated therewith at least one predetermined time delay value; (c) a network interface, coupled to the processor and the memory: (d) program logic for initiating first and second communication connections to a call destination channel; and (e) program logic for terminating the first communication connection after a predetermined delay value associated with one of the carrier identifiers.

According to a sixth aspect, a method for communicating directly with a carrier provided voicemail facility associated with a call destination channel comprises: (a) maintaining in a memory a plurality of carrier identifiers, selected of the carrier identifiers having associated therewith at least one predetermined time delay value; (b) initiating first and second communication connections with the call destination channel; and (c) terminating the first communication connection after expiration of a predetermined time delay value associated with one of the carrier identifiers.

## DETAILED DESCRIPTION OF SPECIFIC EMBODIMENTS

· FIG. 1 illustrates the system architecture for a computer system 100 with which the various computing elements of the disclosed system may be implemented. The exemplary computer system of FIG. 1 is for descriptive purposes only. Although the description may refer to terms commonly used in describing particular computer systems, such as a Personal Computer or other microprocessor base computer architectures, the description and concepts equally apply to other systems, including systems having architectures dissimilar to FIG. 1.

Computer system 100 includes a central processing unit (CPU) 105, which may be implemented with a conventional microprocessor, a random access memory (RAM) 110 for temporary storage of information, and a read only memory

4

(ROM) 115 for permanent storage of information. A memory controller 120 is provided for controlling RAM 110.

A bus 130 interconnects the components of computer system 100. A bus controller 125 is provided for controlling bus 130. An interrupt controller 135 is used for receiving and processing various interrupt signals from the system components. Mass storage may be provided by diskette 142, CD ROM 147, or hard drive 152. Data and software may be exchanged with computer system 100 via removable media such as diskette 142 and CD ROM 147. Diskette 142 is insertable into diskette drive 141 which is, in turn, connected to bus 30 by a controller 140. Similarly, CD ROM 147 is insertable into CD ROM drive 146 which is, in turn, connected to bus 130 by controller 145. Hard disk 152 is part of a fixed disk drive 151 which is connected to bus 130 by controller 150.

User input to computer system 100 may be provided by a number of devices. For example, a keyboard 156 and mouse 157 are connected to bus 130 by controller 155. An audio transducer 196, which may act as both a microphone and a speaker, is connected to bus 130 by audio controller 197, as illustrated. It will be obvious to those reasonably skilled in the art that other input devices, such as a pen and/or tabloid may be connected to bus 130 and an appropriate controller and software, as required. DMA controller 160 is provided for performing direct memory access to RAM 110. A visual display is generated by video controller 165 which controls video display 170. Computer system 100 also includes a communications adapter 190 which allows the system to be interconnected to a local area network (LAN) or a wide area network (WAN), schematically illustrated by bus 191 and network 195.

Operation of computer system 100 is generally controlled and coordinated by commercially available operating system software, such as Windows NT, Unix or Linux that are available from many software companies or organizations. The operating system controls allocation of system resources and performs tasks such as processing scheduling, memory management, networking, and I/O services, among things. In particular, an operating system resident in system memory and running on CPU 105 coordinates the operation of the other elements of computer system 100. The disclosed system may also be implemented with other commercially available operating systems including, Armonk, N.Y.; Windows 95 commercially available from Microsoft Corporation, Redmond, Wash.; Linux, commercially available from Red Hat Software, Research Triangle Park, N.C. or other Linux vendors; Unix, commercially available from SCO Salt Lake City Utah and Solaris, commercially available from Sun Microsystems, Palo Alto, Calif.

Telecommunication Environment

FIG. 2 illustrates a first exemplary hybrid communications environment in which the disclosed system 200A and techniques may be implemented. Both telephony server 210 and SIP server 212 of system 200A are coupled via Voice Over Internet Protocol (VOIP) gateway 213 to a hybrid telecommunication environment including one or more local public switched telephone networks (PSTNs), collectively indicated as telephony network 202. Both telephony server 210 and SIP server 212 are also connected to a global packet-switched network 204, for example, an Internet Protocol (IP) based network, such as the Internet. A caller terminating apparatus 205 and callee terminating apparatus 207 may be connected to one or both of PSTN 202 or IP network 204. System 200A is connected via the telephony network 202 to a carrier's central office or mobile switch 206 which, in turn, is connected to the carrier's voice mail facility 208 which serves as

5

the callee/subscriber. In a contemplated environment, the carrier's central office 206 also includes a gateway 223 and SIP server 222, similar to gateway 213 and server 212, respectively, depending on the specific technology of the carrier system. In the illustrative embodiment, gateway 213 may be implemented with any number of commercially available voice over Internet Protocol gateways such as those commercially available from Cisco Systems. Gateway 213 may be coupled by one or more PRI/T1 ports or other types of connectivity to PSTN network 202. In addition, one or more database services 203, such Neustar, Inc., described herein, may be coupled to network 204.

Network 202 may comprise one or more local PSTN networks, some of which may include traditional network elements, such as a central office, PBXs, routers, trunk lines, fiber optic cables, etc. interconnected to one or more terminating apparatus. Further, any of the local PSTN networks within network 202 may be implemented as either an integrated services digital network (ISDN) or a plain old telephone service (POTS) network. In addition, network 202 may include one or more PSTN long distance carrier service providers that function as a long distance toll network over which calls can be routed. The design and function of network 202, including many such long distance toll networks, being known in the art and not described herein in detail.

Terminating apparatus 205 and 207 may be implemented with either a digital or analog PSTN telephone, mobile phone, VoIP phone or any other apparatus capable of receiving a call such as modems, facsimile machines, etc., such apparatus being referred to collectively hereinafter as a terminating apparatus, whether the network actually terminates. In addition such terminating apparatus may be implemented with an Internet telephony process, or cellular telephone, with or without a web access capabilities. As used herein, the term "call destination channel" comprises any of the telephony infrastructure, including circuitry and virtual logic components, associated with a particular callee number, including the carrier provided voice mail facility associated with such callee number.

Phone Server System

In a first illustrative embodiment, system 200A comprises a telephony server 210, Session Internet Protocol (SIP) server 212, gateway 211, and call status database 214 interconnected to each other over a WAN/LAN 215. Although servers 210 and 212 and database 214 are illustrated as connected via a private network, both servers 210 and 212 and database 214 may be located physically anywhere and accessible to each other over a global public network such as the Internet. Alternatively, servers 210 and 212 and database 214 may execute on the same computer architecture. An Ethernet LAN hub (not shown) may interconnect telephony server 210, database 214, gateway 211, and SIP server 212. Both telephony server 210 and SIP server 212 may be implemented with a computer architecture similar to that illustrated in FIG. 1. The implementations of telephony server 210, database 214, and SIP server 212 are described below in greater detail.

In the disclosed system, telephony server 210 functions to receive call information, and establish the actual voice call with the voice mail facility provided by the callee's carrier, as explained in greater teacher with reference to FIG. 4 herein. Such functionality may be implemented with a control application 218 executing under the control of an operating system. Control application 218 includes the necessary computer code and modules to perform the telephony server 210 processes described with reference to FIG. 4. In addition, server application 218 may perform billing and call record tracking functions, if such service is a paid service. In the

6

illustrative embodiment, Windows NT operating system may be utilized on telephony server 210, although other operating systems also may be used such as Linux or Unix operating systems.

Telephony server 210 further includes an Interactive Voice Response (IVR) module 221 which serves to pass information from caller terminating apparatus 205 to and from telephony server 210. In the illustrative embodiment, IVR module receives data signals from gateway 213 and supplies them through the appropriate APIs to a control module 209 in telephony server 210. The IVR module includes logic to respond to touch-tone commands from a caller. In particular, the IVR module may be configured to translate the Dual Tone Multi-Frequency (DTMF) signal received from a requestor to a machine-readable format, such as ASCII, that is recognizable by database 214. Alternatively, the IVR module may include a word recognition unit that is configured to output digitally recorded words that is converted to ASCII format for delivery to database 214 or telephony server 210. Still further, IVR module may include a processor that executes text-to-speech synthesis programmed instructions designed to use ASCII input, to generate "read aloud" audio prompts of that ASCII input in a machine synthesized voice. The construction, function and implementation of an IVR module suitable for use in the disclosed system including the appropriate device driver and protocol are within the scope of those reasonably skilled in the arts.

In addition, an optional web server application 215 may also be implemented as an executable application running under the control of an operating system. In the illustrative embodiment, the Windows NT operating system may be used, although other operating systems also may be used such as Linux or Unix. Web server application 215 itself may be used implemented with Appache Web Server, along with PHP and Java script programs, or other web application programming languages such as Ruby or Ajax. When the user accesses web server 215, a web page containing one or more dialogue boxes may be used to enter the information of the callee number. When the information is entered, along with any other optional relevant account information, web server 215 connects to the database 214 and transmits to database 214 the account number and the associated phone number.

In the disclosed system, SIP server 212 functions to determine the applicable time delay associated with the identified carrier and to busy the call destination channel to allow the actual call placed by the telephony server 210 to reach the callee's voice mail facility. Such functionality may be implemented with a control application 220 executing under the control of an operating system. Control application 220 includes the necessary computer code and modules to perform the SIP server 212 processes described with reference to FIG. 4. In addition, proxy server application 215 may also be implemented as an executable application running under the control of an operating system. Proxy server application 227 serves to interface with the SIP server at the callee's carrier to establish a signaling only call to the call destination channel, as explained with reference to FIG. 4.

Database 214 and accompanying query server, serves as the central call status database and synchronization mechanism for system 200A, as explained hereafter. Database 214 may be implemented on a computer architecture similar to that illustrated in FIG. 1. In the illustrative embodiment, database 214 is implemented with Oracle database software running on an appropriate Windows operating system or other operating systems such as Unix or Linux. It will be obvious to those skilled in the arts that other operating systems and database software may be equally substituted to implement

US 8,605,869 B1

7

the disclosed system. For example, database **214** may be implemented in accordance with the ODBM database standard and any number of commercially available search query language (SQL) database search engines, such as those available from MicroSoft Corporation, Redmond, Wash.

Database **214** may maintain data structures similar to that illustrated FIG. 6A-B. As show in FIG. 6A, structure **603** is used for storing a unique identifier of a carrier (Carrier ID **605**) and an empirically derived time delay (Time Delay **607**) associated with that carrier. As show in FIG. 6B, structure **600** is used for storing a unique identifier of a call (Call ID **602**), the number to be called (Callee Number **604**), number called from (Caller Number **606**) and a temporal indicator (Time Stamp **608**) indicating the time at which the first signaling call was initiated with the call destination channel, as explained hereinafter. Although the disclosed system described herein may be practiced with a single database, it is also contemplated that multiple databases may be used in addition to or in place of database **214**. Such plural databases may be arranged in any of a parent/child, distributed, peer-to-peer or other configuration to increase fault tolerance in the system. Specifically, a plurality of databases may be operatively coupled, typically through either a virtual private network or IP network to each other. Such databases may be located at geographically disparate locations. In such configuration, any database can store carrier identifiers and delay times values, or ranges of values. In yet another alternative embodiment, in place of a database and search engine, a plurality of look-up tables may be stored in memory of telephony server **210** for use with look-up algorithms from control application **218**.

In the illustrative embodiment, gateway **211** may be implemented similar to gateway **213** described herein.

Calling Process

Referring to FIG. **4**, a hybrid flow chart illustrating the processes performed by system 200A in accordance with the disclosure is shown. First, telephone server **210** receives an incoming call from a terminating apparatus **220**, which may be a traditional PSTN telephone, an Internet telephony process, or a cellular telephone. Next, the IVR module **221** within the telephony server **210** prompts the caller to enter the telephone number of the callee, using, for example, a prerecorded audio file. The caller then specifies, typically through DTMF signals, or the packetized equivalent thereof, telephone number of the callee for which he/she wishes to leave a voicemail message. These processes are illustrated collectively by process block **402**.

Telephony server **210** then sends a request to SIP server **212** to place a call, as illustrated by process block **404**. The request includes the Caller Number **606**, Callee Number **604**, and a Call ID **602** assigned by the telephony server **210**.

SIP server **212** then queries database **203** using all or part of Callee Number **604** to determine if the telephone number is valid, and which carrier is responsible for establishing a connection to such number, as illustrated by process block **406**. The telephone number data in the query may be in the form of a Dialed Number Identification Service (DNIS) string. DNIS is a service provided by telecommunications companies to corporate clients that lets them determine which telephone number was dialed by a customer. This is useful in determining how to answer an inbound call. The telecommunications company sends a DNIS number to the client phone system during the call setup. The DNIS number is typically 4 to 10 digits in length.

Such process may be performed by accesses either an on-line database service or an internal database to determine the Carrier associated with the telephone number. One such on-line database service suitable for use with the disclosed

8

system is commercially available from Neustar, Inc., Sterling, Va. Neustar is a provider of clearinghouse and directory services to the global communications and Internet industry, including data required to route telephone calls in North America, to exchange information with other communications service providers, and to manage technological changes in their own networks. The Neustar service provides to SIP server **212** and identifier of the carrier to which the value of Callee Number **604** is assigned. The results of the database query normally include the name of the Carrier associated with the telephone number in a format that is usable by SIP server **210** as Carrier ID **605**.

Once the carrier associated with the callee number has been identified, SIP server **212** queries database **214** to determine the delay time (Time Delay **607**) associated with the identified carrier. In the illustrative embodiment, the values for a time delay or acceptable range of time delays for the various carriers within a region, e.g., the United States, have been empirically determined after testing with multiple time delay values. Since the number of carriers in the United States is relatively small, the data structure **603** in which the time delays are stored in a memory may be implemented with either database **214** or embedded directly within be algorithmic code of control module **220**. Time Delay **607** associated with a carrier represents the interval of time that the SIP server **212** must wait following initiation of a signaling call with the call destination channel identified by the Callee ID before the signaling call is terminated by the SIP server **212**. Such time delays are chosen to represent the amount of time necessary for the call destination channel to be busied by the signaling call without the callee actually being notified of an incoming call by its respective carrier. As such, the time delay enables a voice call to be routed to a callee's voice mail facility transparently. Such delay times vary by the responsiveness of a carrier network infrastructure. In the illustrated embodiment Time Delay **607** will typically have a value in the range from between 100 milliseconds to 5 seconds, with most carriers needing a range of between 300 milliseconds to 3.5 seconds. If the time delay value is too short, the call destination channel will not be busied long enough for the second call to be routed to the callee's voicemail. If the time delay value is too long, the carrier will notify the callee of the incoming signaling call which, if answered, will contain no audio data according to the illustrative embodiment.

Next, SIP server **212** sends a signal call to VoIP gateway **213** containing Callee Number **604** and Caller Number **606** and the records a value for Time Stamp **608** in the location of data structure **600** associated with the respective Call ID **602**, as illustrated by process block **408**, indicating the time at which the signaling call was initiated. In the illustrative embodiment, the signaling call does not contain audio data. Thereafter, upon receiving acknowledgment from the carriers SIP server **222**, the SIP server **212** waits for a period of time substantially equal to the time delay associated with the identified carrier before sending a hang up signal to the gateway **213**, as illustrated by process block **410**. Such process may be implemented with a sleep function, e.g. a software timer, in control application **220** to wait for a period equal to the time delay. Substantially simultaneously with sending of a the signal call to VoIP gateway **213**, a timer, typically a software implemented up-counter or down-counter algorithm, counts for a period of time equal to the value of Time Delay **607**. Upon expiration of such counter process, an interrupt is generated notifying control application **220** to terminate the signaling call.

In the illustrated embodiment, database **214** serves as a synchronization mechanism between telephony server **210**

9

and SIP server **212**. The recordation of a value for Time Stamp **608** for a particular Call ID **602** serves as a synchronization mechanism by which telephony server **210** is notified that a signaling call has been placed. Telephony server **210** monitors the status of the Call ID **602** representing the SIP signaling call in database **214**, as illustrated by process block, and, if the value for Time Stamp **608** indicates that SIP signaling call has been initiated, telephony server **210** will place a call to the call destination channel identified by the value of the Callee Number **604**, as illustrated by the decisional block **414** and process block **416**, through gateway **213** and telephony network **202**.

As a result of the above technique, the carrier central office or mobile switch **206** receives two calls, a first call comprising signaling data but no audio data, and a second call comprising both signaling data and audio data. The first call routed to the callee's terminating apparatus **207** and then hang up within a period of time which prevents the carrier from notifying the callee's terminating apparatus that a call has been placed to the callee's number. The second call is processed normally and routed to the carrier voice mail system **208**, since the carrier central office or mobile switch **206** detects that the callee is already processing a call.

Referring to FIG. **5**, the exchange of messages within the SIP protocol are illustrated. In the first illustrative embodiment. SIP is used to trigger the signaling call. VoIP using SIP is divided into two parts: first, the singling call set up, and, second, the RTP streaming between the originating and terminating gateways. Control application **220** in SIP server **212** signals the gateway that a call is placed using only the signaling part of SIP. The exchange of messages using the SIP protocol is as follows. A SIP task (sip:user1@here.com) executing on SIP server **212** sends an INVITE message through gateway **213** to carrier SIP proxy server **223**, which, in turn, forwards the INVITE message to carrier gateway **225**. A reply SIP task (sip:user2@there.com) executing on Carrier SIP server **225** forwards a reply message 200 OK to SIP server **212**. The SIP server **212** then forwards an ACK message back to carrier SIP proxy server **223** establishing a final path for the first signaling call in which the caller number and the callee number will be forwarded on to carrier gateway **225**. The carrier or terminating network sends back the call status (call progress, call answered, . . . ). Once the call status 200 OK message is received by SIP server **212**, meaning the call was successful, the signaling call is hang up or terminated. The Time Delay value after which the call is hang up after receiving 200 OK depends on the terminating carrier. Such duration may be empirically derived through trial and error for each of the terminating carriers. The first SIP call does not contain any RTP streams—meaning actual conversation packets. During the second call initiated by the telephony server **210**, the RTP streaming between the originating gateway **213** and the terminating gateway **225** is established to enable transmission of audio data, as illustrated by the media path in FIG. **5**.

Various SIP responses codes used for communication between the respective SIP servers are illustrated in Table 1 herein. Such SIP responses complement the SIP Requests, which are used to initiate action such as the phone conversation. Note that the Reason Phrases of the responses listed in Table 1 are only recommended examples, and can be replaced with local equivalents without affecting the protocol.

A commercially available service which implements all or part of the disclosed systems and techniques described herein

10

is offered by Mobilesphere, Inc., Boston. Mass. at http://www.slydial.com on the worldwide web.

## Alternative Embodiment

FIG. **3** illustrates a second exemplary communications environment in which the disclosed system **200B** and techniques may be implemented. In this environment caller terminating apparatus **205**, callee terminating apparatus **207**, telephony network **202**, carrier's central office or mobile switch **206**, carrier's voice mail facility **208** and telephony server **210** may have similar structure and function as described with reference to the environment of FIG. **2**. Telephony server **210** of system **200B** may be coupled to telephony network **202** through one or more T1/E1 digital telephony interface circuit cards, such as those commercially available from Dialogic Corporation of Parsippany, N.J., or by one or more Primary Rate Interchange (PRI)/T1 ports.

In a second disclosed technique utilizing system **200B**, the telephony server **210** receives the call data from the caller, as similarly to that previously described with reference to process block **402** of FIG. **4**. Thereafter. telephony server **210** places two almost simultaneous calls over telephony network **202** to the callee terminating apparatus **207**. The first call busies out the first channel associated with the callee. The second call (the actual voice call) forces the carrier to route the second call to the carrier's voice mail facility **208** associated with the callee since the first signaling call busied the call destination channel.

In such alternative embodiment, the two calls are separated by the period of time necessary for telephony server **210** to confirm that the first call has been established with the call destination channel. Once such confirmation is received telephony server **210** initiates a second call to the call destination channel. Simultaneously. the first call is terminated after a predetermined time interval which may be tracked using a software timer, similar to the previously described embodiment. In such alternative embodiment, the predetermined time may have a value in the range from between 100 milliseconds to 5 seconds with most carriers needing a range of between 300 milliseconds to 3.5 seconds. Values for the predetermined time values may have a format similar to Time Delay **607** and may be stored in a data structure **603** similar to that shown in FIG. **6**A as part of look-up table in memory or as part of a database. In system **200B** in the described herein or with a traditional PSTN telephony server platform that does not require either a database **214** or SIP server **212**, but which interfaces directly with telephony network **202**.

### TABLE 1

| Informational Responses (1xx) | |
|---|---|
| 100 | Trying (extended search being performed may take a significant time |
| 180 | Ringing |
| 181 | Call Is Being Forwarded |
| 182 | Queued |
| 183 | Session Progress |
| Successful Responses (2xx) | |
| 200 | OK |
| 202 | accepted: It Indicates that the request has been understood but actually can't be processed |
| Redirection Responses (3xx) | |
| 300 | Multiple Choices |
| 301 | Moved Permanently |
| 302 | Moved Temporarily |
| 305 | Use Proxy |

US 8,605,869 B1

11

TABLE 1-continued

| | |
|---|---|
| 380 | Alternative Service |
| | Client Failure Responses (4xx) |
| 400 | Bad Request |
| 401 | Unauthorized (Used only by registrars or user agents). |
| 402 | Payment Required (Reserved for future use) |
| 403 | Forbidden |
| 404 | Not Found (User not found) |
| 405 | Method Not Allowed |
| 406 | Not Acceptable |
| 407 | Proxy Authentication Required |
| 408 | Request Timeout (Couldn't find the user in time) |
| 410 | Gone (The user existed once, but is not available here any more.) |
| 412 | Conditional Request Failed |
| 413 | Request Entity Too Large |
| 414 | Request-URI Too Long |
| 415 | Unsupported Media Type |
| 416 | Unsupported URI Scheme |
| 417 | Unknown Resource-Priority |
| 420 | Bad Extension (Bad SIP Protocol Extension used, not understood by the server) |
| 421 | Extension Required |
| 422 | Session Interval Too Small |
| 423 | Interval Too Brief |
| 428 | Use Identity Header |
| 429 | Provide Referrer Identity |
| 433 | Anonymity Disallowed |
| 436 | Bad Identity-Info |
| 437 | Unsupported Certificate |
| 438 | Invalid Identity Header |
| 480 | Temporarily Unavailable |
| 481 | Call Transaction Does Not Exist |
| 482 | Loop Detected |
| 483 | Too Many Hops |
| 484 | Address Incomplete |
| 485 | Ambiguous |
| 486 | Busy Here |
| 487 | Request Terminated |
| 488 | Not Acceptable Here |
| 489 | Bad Event |
| 491 | Request Pending |
| 493 | Undecipherable (Could not decrypt S/MIME body part) |
| 494 | Security Agreement Required |
| | Server Failure Responses (5xx) |
| 500 | Server Internal Error |
| 501 | Not Implemented: The SIP request method is not implemented here |
| 502 | Bad Gateway |
| 503 | Service Unavailable |
| 504 | Server Time-out |
| 505 | Version Not Supported: The server does not support this version of the SIP protocol |
| 513 | Message Too Large |
| 580 | Precondition Failure |
| | Global Failure Responses (6xx) |
| 600 | Busy Everywhere |
| 603 | Decline |
| 604 | Does Not Exist Anywhere |
| 606 | Not Acceptable |

The above-described system may be implemented in either all software, all hardware, or a combination of hardware and software, including program code stored in firmware format to support dedicated hardware. A software implementation of the above described embodiment(s) may comprise a series of computer instructions either fixed on a tangible medium, such as a computer readable media, e.g. diskette 142, CD-ROM 147, ROM 115, or fixed disk 152 of FIG. 1, or transmittable to a computer system, via a modem or other interface device, such as communications adapter 190 connected to the network 195 over a medium 191. Medium 191 can be a tangible medium, including but not limited to optical or analog communications lines. The series of computer instructions embodies all or part of the functionality previously described

12

herein with respect to the disclosed system. Those skilled in the art will appreciate that such computer instructions can be written in a number of programming languages for use with many computer architectures or operating systems. Further, such instructions may be stored using any memory technology, present or future, including, but not limited to, semiconductor, magnetic, optical or other memory devices, or transmitted using any communications technology, present or future, including but not limited to optical, infrared, microwave, or other transmission technologies. It is contemplated that such a computer program product may be distributed as a removable media with accompanying printed or electronic documentation, e.g., shrink wrapped software, preloaded with a computer system, e.g., on system ROM or fixed disk, or distributed from a server or electronic bulletin board over a network, e.g., the Internet or World Wide Web.

Although various exemplary embodiments have been disclosed, it will be apparent to those skilled in the art that various changes and modifications can be made which will achieve some of the advantages without departing from the spirit and scope of the disclosed system and techniques. For example, although one of the described embodiments uses the SIP protocol, other VoIP protocols such as H.323 can be used to achieve the same result. Others different messaging clients and protocols may be utilized as well. In addition, numerous programming techniques utilizing various data structures and memory configurations may be utilized to achieve the results of the inventive system described herein. For example, the tables and record structures may be implemented as objects and the described databases may be implemented in different configurations, while still achieving the same results. Further, many of the system components described herein have been described using commercially available products. It will be obvious to those reasonably skilled in the art that other components performing the same functions may be suitably substituted. Further, the disclosed methods may be achieved in either all software implementations, using the appropriate processor instructions, or in hybrid implementations which utilize a combination of hardware logic and software to achieve the same results as well as other modifications to the implementations of the disclosure as are intended to be covered by the any claims deriving priority herefrom.

What is claimed is:

1. A method for communicating directly to a carrier provided voicemail facility associated with a call destination channel comprising:

A) Initiating a first communication connection with a call destination channel associated with one of a plurality of carriers;

B) prior to the first communication connection being terminated, simultaneously initiating a second communication connection to the same call destination channel; and

C) terminating the first communication connection within a predetermined time period following initiation of the first communication connection,

wherein the predetermined period of time is at least partially determined by which of the plurality of carriers is associated with the call destination channel.

2. The method of claim 1 wherein the first communication connection comprises only signal data.

3. The method of claim 1 wherein the second communication connection comprises signal data and voice data.

4. The method of claim 1 wherein the second communication connection is initiated to the call destination channel within a predetermined period of time after the first communication connection is initiated to the call destination channel.

US 8,605,869 B1

**13**

5. The method of claim **4** wherein the second communication connection is initiated to the call destination channel upon confirmation that the first communication connection has been established with the destination channel.

6. A method for forcing a communication connection with a carrier provided voicemail facility associated with a call destination channel comprising:

(a) busying with a first communication connection, a call destination channel associated with one of a plurality of carriers without alerting a callee associated therewith;

(b) prior to the first communication connection being terminated, simultaneously initiating a second communication connection to the same call destination channel; and

(c) establishing a voice communication connection with the carrier provided voicemail facility associated with the call destination channel.

7. The method of claim **6** wherein (a) further comprises:

(a1) terminating the first communication connection within a predetermined time period at least partially determined by which of the plurality of carriers is associated with the call destination channel.

8. The method of claim **6** wherein (b) comprises:

(b1) initiating a second communication connection to the call destination channel within a predetermined time period following initiation of the first indication connection.

9. The method of claim **6** wherein (b) comprises:

(b1) initiating a second communication connection to the call destination channel upon confirmation that a communication connection has been established with the destination channel.

10. The method of claim **8** wherein the second communication connection comprises signal data and voice data.

11. The method of claim **9** wherein the second communication connection comprises signal data and voice data.

12. The method of claim **6** wherein the first communication connection comprises only signal data.

13. A computer program product for use with a computer system operatively coupled to a communication network, the computer program product comprising a non-transitory computer readable medium having program code embodied thereon comprising:

(a) program code for initiating a first communication connection to a call destination channel associated with one of a plurality of carriers;

(b) program code for, prior to the first communication connection being terminated, simultaneously initiating a second communication connection to the same call destination channel; and

(c) program code for terminating the first communication connection within a predetermined period of time after the first communication connection is initiated to the call destination channel;

wherein the predetermined period of time is at least partially determined by which of the plurality of carriers is associated with the call destination channel.

14. The computer program product of claim **13** wherein (a) further comprises:

(a1) program code for receiving an identifier of the call destination channel.

15. The computer program product of claim **14** wherein (a) further comprises:

(a2) program code for determining from the identifier of the call destination channel, a carrier associated with the destination channel.

**14**

16. The computer program product of claim **15** wherein (a) further comprises:

(a3) program code for determining, from the identified carrier associated with the destination channel, a predetermined time delay associated with the identified carrier.

17. The computer program product of claim **13** wherein the first communication connection comprises only signal data.

18. The computer program product of claim **13** wherein the second communication connection comprises signal data and voice data.

19. The computer program product of claim **13** wherein the second communication connection is initiated to the call destination channel within a predetermined period of time after the first communication connection is initiated to the call destination channel.

20. The computer program product of claim **13** wherein the second communication connection is initiated to the call destination channel upon confirmation that a communication connection has been established with the destination channel.

21. A computer program product for use with a computer system operatively coupled to a communication network, the computer program product comprising a non-transitory computer readable medium having program code embodied thereon comprising:

(a) program code for busying with a first communication connection, a call destination channel associated with one of a plurality of carriers without alerting a callee associated therewith;

(b) program code for, prior to the first communication connection be terminated, simultaneously initiating a second communication connection to the same call destination channel; and

(c) program code for establishing a voice communication connection with the carrier provided voicemail facility associated with the call destination channel.

22. The computer program product of claim **21** wherein (a) further comprises:

(a1) program code for terminating the first communication connection within a predetermined time period at least partially determined by which of the plurality of carriers is associated with the call destination channel.

23. The computer program product of claim **21** wherein (b) comprises:

(b1) program code for initiating a second communication connection to the call destination channel within a predetermined time period following initiation of a first communication connection.

24. The computer program product of claim **21** wherein (b) comprises:

(b1) program code for initiating a second communication connection to the call destination channel upon confirmation that a communication connection has been established with the destination channel.

25. The computer program product of claim **24** wherein the second communication connection comprises signal data and voice data.

26. The computer program product of claim **23** wherein the second communication connection comprises signal data and voice data.

27. The computer program product of claim **24** wherein the first communication connection does not contain voice data.

28. The computer program product of claim **24** wherein the first communication connection comprises only signal data.

29. An apparatus for use with a communications network comprising:

(a) a processor;

US 8,605,869 B1

15

(b) a memory coupled to the processor for maintaining a plurality of carrier identifiers, selected of the carrier identifiers having associated therewith at least one predetermined time delay value, the respective predetermined time delay values not being identical for all carrier identifiers;

(c) a network interface, coupled to the processor and the memory;

(d) program logic, responsive to an identifier of the call destination channel, for determining which of the plurality of carrier identifiers is associated with a call destination channel;

(e) program logic for initiating a first communication connection to the call destination channel;

(f) program logic for, prior to the first communication connection being terminated, simultaneously initiating a second communication connection to the same call destination channel; and

(g) program logic for terminating the first communication connection after expiration of a time period at least equal to the predetermined delay value associated with the identified carrier associated with the call destination channel.

**30.** A method for communicating directly with a carrier provided voicemail facility associated with a call destination channel comprising:

16

(a) maintaining in a memory a plurality of carrier identifiers, selected of the carrier identifiers having associated therewith at least one predetermined time delay value, the respective predetermined time delay values not being identical for all carrier identifiers;

(b) initiating first and second communication connections, to a call destination channel associated with one of the carrier identifiers; and

(c) terminating the first communication connection after expiration of the predetermined time delay value associated with the carrier identifier associated with the call destination channel.

**31.** The method of claim **30** wherein (b) further comprises:

(b1) receiving an identifier of the call destination channel.

**32.** The method of claim **31** wherein (b) further comprises:

(b2) determining from the identifier of the call destination channel the carrier associated with the destination channel.

**33.** The method of claim **32** wherein (b) further comprises:

(b3) determining from the identified carrier associated with the destination channel, a predetermined time delay value.

**34.** The method of claim **30** wherein the first communication connection comprises only signal data.

**35.** The method of claim **30** wherein the second communication connection comprises signal data and voice data.

* * * * *

– Enforcement staff has determined there is a probable violation that, if proven, presents a threat to the public; and
– The seriousness of the violation is appropriate for suspension and/or revocation of a contractor's license and/or referral to a local prosecutor for the filing of criminal charges (this disclosure includes a disclaimer that the complaints disclosed are only allegations at the present time).

**Will CSLB keep me informed about the status of the complaint filed against my license?**

Investigation of complaints can be a lengthy process. In order to keep you apprised of the status of the complaint, CSLB will notify you:

- When the complaint is received and assigned to a CSR;
- When the complaint is transferred to an Investigative Center (if mediation fails to resolve it);
- When a citation or accusation is issued, and/or
- When the complaint is closed.